* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Deluca and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. The Full Commission adopts the Opinion and Award of Deputy Commissioner Deluca with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. This claim is subject to the North Carolina Workers' Compensation Act.
2. The Industrial Commission has personal and subject matter jurisdiction in this case.
3. An employment relationship existed between plaintiff and defendant at all relevant times in this case. *Page 2 
4. Defendant employed three or more employees at all times relevant in this case.
5. Plaintiff's average weekly wage is $403.76.
6. Plaintiff sustained a compensable injury by accident on or about April 20, 2004.
7. Medical records and a job description were stipulated into the record. Plaintiff's Exhibits 1 — 4 and Defendant's Exhibit 1 were also admitted into the record.
 * * * * * * * * * * *
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff was born on July 24, 1963. She earned a GED and a certification in massage therapy. She has training as an orthopedic technician and has work experience in photograph retouching.
2. Plaintiff began employment with defendant as an orthopedic technician in March 2004. Plaintiff was injured while working for defendant on April 20, 2004, when helping to place a patient's leg in traction for a fractured femur, the rope on the pulley slipped. Plaintiff went to catch the patient's leg with her right arm, sustaining an injury to her neck. Defendant accepted the event as compensable and provided medical treatment. Plaintiff was initially treated for a possible rotator cuff injury.
3. On August 25, 2004, Dr. Van Evanoff, Jr., performed a right C5-6 transforaminal epidural injection under fluoroscopic guidance as treatment for her April 20, 2004 neck injury. Plaintiff alleged that she sustained another injury as the result of this August 25, 2004 steroid injection. Plaintiff testified that she heard a pop during the injection and immediately experienced muscle spasms, increased shoulder and neck pain, and substantially decreased *Page 3 
ability to rotate her head to the right from that day through the date of hearing before the deputy commissioner. Plaintiff discussed her increased symptoms following the injection with the nurse, Ann Holden. Dr. Van Evanoff, Jr. noted in plaintiff's medical record that plaintiff tolerated the procedure well without any complication and that plaintiff reported some reduction of her typical pain symptoms within a few minutes after the injection. Plaintiff was instructed to contact Dr. Van Evanoff, Jr.'s office with any questions or concerns after the procedure.
4. On September 2, 2004, plaintiff treated with Dr. John G. Bentley. On September 9, 2004 Dr. Bentley noted plaintiff's increased complaints of neck pain and neck spasms. During his physical examination of plaintiff he noted that plaintiff's movements particularly of the bilateral upper extremities seemed to have no pain inhibition, but when Dr. Bentley tested plaintiff's right upper extremity she had pain inhibition in all movements in all muscles. Dr. Bentley noted a feigned weakness in all muscles including intrinsic hand muscles, wrists extensors, flexors, and elbow extensors and flexors. Plaintiff had subjective decreased sensation in the right first, second, and third distribution. Dr. Bentley did not testify, nor did he reference at any time in his records that plaintiff sustained a second injury or aggravation to her condition on August 25, 2004.
5. On August 6, 2004 and September 10, 2004, Dr. Tolbert examined plaintiff and noted decreased range of motion in rotation of her neck to the right, increased right shoulder pain, and a further decrease in grip strength. Dr. Tolbert attributed plaintiff's neurological symptoms to nerve impingement and the failure of treatment to address that issue more quickly. He opined that the injection did not further injure plaintiff, other than to irritate an already inflamed disc. *Page 4 
6. On September 13, 2004, plaintiff saw Dr. David R. O'Brien. Dr. O'Brien noted that plaintiff stated since the epidural she has had some spasm in the levator scapulae bilaterally but no other problems from the injection. In the physical examination section of the record he noted that when plaintiff was distracted she had fairly good range of motion of her neck without any signs of pain or limitations. However, when objectively tested, plaintiff's range of motion with extension and flexion and rotation to the right were virtually absent. Rotation to the left was mildly limited by about 25%. Plaintiff's shoulder range of motion was full in all directions. In testing the right upper extremity muscle groups Dr. O'Brien noted that there appeared to be weakness due to effort inhibition. He concluded the examination section of his note by stating that there was no evidence of where her injection ever took place and that he did not appreciate any spasm of the levator scapula. Dr. O'Brien opined that plaintiff's left arm pain and numbness in the C8 and/or T1 distribution was of unknown etiology. He referenced the fact that plaintiff thought she could not work at sedentary work at the time and he noted her frustration with defendant. Dr. O'Brien indicated that he gave plaintiff the benefit of the doubt and took plaintiff out of work. Dr. O'Brien ordered nerve conduction studies and EMG tests of the right upper extremity to see if there was any objective evidence of any denervation or other abnormality, due to the fact that plaintiff's upper extremity symptoms were not in any specific dermatomal or radicular pattern and that plaintiff had inconsistencies on her exam. Dr. O'Brien noted that the EMG test was relatively unremarkable and only showed a right C6 radiculopathy, which he would not find surprising given plaintiff's MRI findings. Dr. O'Brien did not testify, nor opine that plaintiff sustained a second injury or aggravation on August 25, 2004 to her April 20, 2004 work related condition. *Page 5 
7. On September 21, 2004, plaintiff saw Dr. William R. Brown, Jr. Dr. Brown did not testify in the case, nor did he state in any record that plaintiff was injured or that she aggravated her condition on August 25, 2004.
8. On September 22, 2004, plaintiff saw Dr. Thomas A. Sweasey. Dr. Sweasey did not testify in the case, nor did he state in any record that plaintiff sustained a second injury or an aggravation to her condition on August 25, 2004.
9. On November 11, 2004, Dr. Scott Ellison reviewed plaintiff's medical notes and made a report. He did not reference any alleged second injury on August 25, 2004, nor did he testify in the case.
10. On November 29, 2004, Dr. Sweasey performed an anterior cervical discectomy and fusion C4-5, C5-6 with allograft bone and anterior cervical plate. Plaintiff recovered well from this surgery. On December 15, 2004, Dr. Sweasey noted that overall plaintiff had done extremely well. On January 11, 2005, Dr. Sweasey again noted that plaintiff was doing well and was very comfortable and that she was not taking any significant pain medication. He further noted that plaintiff's wound was healing well and that her x-rays show good alignment.
11. On February 22, 2005, Dr. Sweasey found that plaintiff had some mild degenerative change just above the fusion, which did not appear to be interfering with her lifestyle. Dr. Sweasey noted that plaintiff was going to return to normal activity and was to follow up with him in three months. Dr. Sweasey gave plaintiff a note to return to work full-duty in two weeks, indicating a return to work date of March 8, 2005.
12. On May 17, 2005, Dr. Sweasey noted that plaintiff's progress was excellent and that plaintiff had made a good recovery. Dr. Sweasey wanted to follow up with plaintiff in three months. *Page 6 
13. On May 26, 2005, Celeste Harris, plaintiff's former counsel wrote Dr. Sweasey, asking whether, in his opinion, if plaintiff sustained any permanent partial disability. Dr. Sweasey signed an Industrial Commission Form 25R, indicating plaintiff had a ten percent (10%) permanent partial disability rating to her cervical spine. This Form 25R is not dated.
14. Dr. Sweasey opined in his August 9, 2005, note that plaintiff had done well with her fusion with the exception of having some limitation of her neck rotation to the right, but she was working on that. He further noted that plaintiff's limited neck rotation did not appear to be specifically related to the surgery. He was hopeful that with time plaintiff's rotation would improve.
15. On December 5, 2005, adjuster Angel Rich wrote Dr. Sweasey asking whether plaintiff was discharged from care or whether there was a need for continued medical treatment. Dr. Sweasey responded with a handwritten note at the bottom of the letter indicating there were no changes from his previous evaluation.
16. On January 17, 2006, Dr. Sweasey saw plaintiff and noted that plaintiff had indicated increased pain in her right shoulder and some limitation with looking to the right, which plaintiff indicated had been present since her epidural steroid injection prior to her surgery by Dr. Sweasey.
17. On April 6, 2006, plaintiff saw Dr. John Peter Birkedal, a physician of plaintiff's own choosing, whom defendant agreed to authorize as plaintiff's treating physician. Dr. Birkedal noted the original neck injury and plaintiff's report that she felt something pop during the epidural injection, but it was not documented. Plaintiff indicated to Dr. Birkedal that the injection did not help, and since the injection she has not been able to turn her head to the right. *Page 7 
Dr. Birkedal did not testify in the case nor did he state in any record that plaintiff sustained a second injury or an aggravation to her condition on August 25, 2004.
18. The Full Commission finds that although plaintiff did not sustain a second injury by accident on August 25, 2004, plaintiff's limitations with her range of motion in her neck, which she attributes to her epidural steroid injection, are a direct and natural result of her April 24, 2004 compensable injury.
19. After being released in March 2005 to full-duty work by Dr. Sweasey, plaintiff returned to regular full-duty work for defendant on April 11 and 12, 2005 in a receptionist/greeter position. Plaintiff testified and the undersigned find that the receptionist/greeter position was not make-work. Defendant originally offered work to plaintiff on the 3:00 p.m. to 11:00 p.m. shift and then the 3:00 a.m. to 11:00 a.m. shift. However, as plaintiff could not work these shifts for reasons not related to her work injury, defendant accommodated plaintiff's scheduling needs by allowing plaintiff to work during the 11:00 p.m. to 7:00 a.m. shift.
20. When plaintiff arrived at 11:00 p.m. on April 11, 2005 to begin her first shift, another employee was in the same work area as plaintiff until 3:00 a.m., resulting in an overlapping of shifts during busy times. There was only one desk, one chair, and one computer. Ms. Heather Norman, an emergency department nurse manager for defendant, testified the overlap in shifts was to accommodate plaintiff's scheduling conflicts and to provide better customer service during busy times. This would also assist plaintiff in becoming oriented with the shift and position. Although, there were no other shifts with overlapping full-time positions, other nurses from throughout the department were often used during all shifts to assist the receptionist/greeter during busy times. *Page 8 
21. Plaintiff also testified that she asked a nurse for an additional chair when she returned to work on April 11 and April 12, 2005, but did not receive one. Plaintiff testified that as a result of not being able to sit down between 11:00 p.m. and 3:00 a.m., she experienced significant pain in her neck. After two shifts, she called defendant and informed a nurse whose name she did not recall that she was resigning from her job with defendant because of increased pain. However, the greater weight of the evidence shows that plaintiff never communicated her concerns about the lack of a chair and its relationship to increased pain to Ms. Martin, her direct supervisor, to human resources, or to Ms. Rich.
22. Plaintiff testified that she finds it more comfortable if she can move around during her shift. However, plaintiff did not inform her supervisor that she needed to be able to move around. Plaintiff's supervisor, Ms. Martin, testified that if plaintiff had expressed her concerns about not being able to sit down, defendant would have modified the position by putting another chair in the area. The undersigned find as fact that plaintiff did not request a chair or inform defendant of any accommodations she needed to perform her duties.
23. Plaintiff claims that she was not physically capable of performing the receptionist position; however, the job description for the receptionist position indicates physical requirements of sitting, standing, bending, stooping, kneeling, reaching, lifting supplies, manual dexterity, seeing, hearing, and speaking. The job description does not require prolonged sitting or standing, nor does it prevent plaintiff from moving or changing positions. Plaintiff was not restricted by any physician from fulfilling any of the job's physical requirements while employed as a receptionist/greeter for defendant.
24. Plaintiff had no medical restrictions assigned by any doctor at any time after March 8, 2005. The Full Commission finds as fact that plaintiff's April 20, 2004 injury by *Page 9 
accident nor any events from August 25, 2004 prevented plaintiff from performing the receptionist/greeter position for defendant in April 2005. The undersigned find that the receptionist/greeter position that plaintiff began on April 11, 2005 was suitable employment. As such, plaintiff's voluntary resignation on April 12, 2005 was a refusal of suitable employment, for which plaintiff has not shown justification.
25. Plaintiff did not show good cause as to why the Industrial Commission should not allow defendant to assign a nurse case manager to her case pursuant to Commission Rules.
26. At the hearing before the deputy commissioner, plaintiff attempted to raise several additional issues for the first time. Defendant had no notice of these additional issues prior to the hearing before the deputy commissioner. Deputy Commissioner Deluca found these remaining issues to be moot and/or beyond the jurisdiction of the Industrial Commission with the exception of the issue regarding a fee for plaintiff's prior attorney and advised plaintiff that she may separately file a request for a hearing with respect to the attorney's fee issue.
 * * * * * * * * * * *
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff suffered a compensable injury on or about April 20, 2004. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff did not prove that she sustained a compensable injury on August 25, 2004. However, the Full Commission concludes that the symptoms plaintiff attributed to the injection of August 25, 2004, are a direct and natural result of plaintiff's April 20, 2004 injury by accident. Cooperv. Cooper Enters., Inc., 168 N.C. App. 562, 608 S. E. 2d 104 (2005) (quoting Vandiford v. Equipment Co., 98 N.C. App. 458, 391 S.E.2d 193
(1990)). *Page 10 
3. On April 13, 2005, plaintiff refused suitable employment pursuant to N.C. Gen. Stat. § 97-32 without sufficient justification. Therefore, plaintiff's claim for disability benefits shall be suspended until such refusal ceases.
4. Plaintiff did not prove entitlement to disability in excess of her current rating. At no time after March 8, 2005 did plaintiff prove that she could not work in the same or any other employment as a result of the April 20, 2004, injury, or as the result of any events occurring on August 25, 2004.
5. Plaintiff has not shown good cause as to why the rehabilitation professional should be removed from this case.
6. Plaintiff is entitled to all treatment related to her April 20, 2004 compensable injury, including the symptoms plaintiff experienced as a result of the August 25, 2004 injection, as is reasonably necessary to effect a cure or provide relief. N.C. Gen. Stat. § 97-25.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for injuries allegedly sustained on August 25, 2004, is denied.
2. Plaintiff's claim for disability benefits related to her April 20, 2004 injury by accident is suspended until plaintiff's refusal of suitable employment ceases.
3. Defendant shall provide plaintiff with medical treatment related to her compensable injury as is reasonably necessary to effect a cure or provide relief.
4. Although plaintiff has been assigned a ten percent (10%) PPD rating to her spine, an award of compensation will not be made until plaintiff obtains a new rating. *Page 11 
5. Based upon the facts set forth in Finding of Fact 26, in lieu of the requirement of filing a Form 33, this case is hereby reopened for admission of additional evidence and remanded to Deputy Commissioner Deluca to consider evidence subsequent to the deputy commissioner hearing regarding new PPD ratings, the taking of depositions of Dr. Sweasey and Dr. Birkedal, and whether plaintiff has experienced a change of condition. This case is further remanded to Deputy Commissioner Deluca to determine any outstanding disputed issues pertaining to her counsel's earned fee in the case prior to her counsel's withdrawal and any outstanding issues plaintiff raised at the hearing before Deputy Commissioner Deluca. Deputy Commissioner DeLuca shall make findings of fact and issue an Opinion and Award on all issues remanded from the Full Commission.
6. This case is hereby referred to the North Carolina Industrial Commission Fraud Unit to investigate any violation of workers' compensation law by defendants as claimed by plaintiff.
7. Defendant shall bear the costs, including an expert witness fee for Dr. Tolbert in the amount of $360.00.
This the 9th day of August 2007.
 S/______________________
 BUCK LATTIMORE
 COMMISSIONER
CONCURRING:
 S/______________________ DIANNE C. SELLERS *Page 12 
COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER *Page 1